IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALFONSO R. THOMPSON, SR.,

      Plaintiff,

v.                                                                                            CIV 14-1097 MCA/KBM

DET. R. LANDAVAZO, Primary Homicide,

      Defendant.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER comes before the Court on Defendant's *Martinez* Report, which Defendant requests that this Court construe as a Motion for Summary Judgment (*Doc. 17*), filed December 11, 2015. The Honorable M. Christina Armijo referred this matter to me on December 8, 2014, to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case. *Doc. 2.* Having considered the parties' submissions, the relevant law, and the record in this case, the Court recommends that Defendant's Motion for Summary Judgment be granted.

### I.    BACKGROUND[1]

Alfonso R. Thompson, Sr. ("Plaintiff") was arrested and charged with a series of crimes stemming from a double homicide occurring at the Warren Apartments in Albuquerque New Mexico on April 28, 2012. *Doc. 17-34* at 3. Plaintiff's co-defendant,

---

[1] The following facts are either undisputed by the parties or, where disputed, are presented in the light most favorable to Plaintiff. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Facts set forth in Defendant's Motion for Summary Judgment that are not specifically controverted by Plaintiff are deemed undisputed. *See* D.N.M. LR-Civ. 56.1(b).

1

Shalaka Booker, pled guilty to charges arising from these incidents. *Doc. 17-37* at 18. Plaintiff was later acquitted on all charges after a jury trial. *Doc. 17-36* at 18.

On December 3, 2014, Plaintiff, proceeding *pro se*, filed a Civil Rights Complaint pursuant to 42 U.S.C. § 1983 in this Court. *Doc. 1*. Plaintiff named as defendants twenty-one (21) individuals or entities associated with the investigation of these crimes. *Id.* at 2-3. However, only Plaintiff's claims against Detective Russ Landavazo ("Defendant") remain pending.[2] As pled in the Complaint, Plaintiff alleges that Defendant maliciously prosecuted him in violation of the Fourth Amendment. *Id.* at 3-4. Plaintiff characterizes the damages he seeks as punitive damages, mental and emotional injury, injury to property, defamation of character, and false imprisonment. *Doc. 1* at 3; *Doc. 21* at 1.

Plaintiff's allegations center on an asserted lack of probable cause to support his arrest. *Doc. 21* at 2-6. After completing his investigation of the subject incidents, Defendant Landavazo prepared an arrest warrant for Plaintiff which was signed by New Mexico District Court Judge Loveless. *Doc. 17-34* at 3 (Arrest Warrant); *Doc. 17-39* at 15 (Defendant's Affidavit). Defendant's affidavit offered in support of the arrest warrant application provided as follows:[3]

> On April 28, 2012 at approximately 0248 hours Albuquerque Police Department (APD) Dispatch received calls from several residents of the "Warren Apartments" located at 7601 Lomas Blvd. NE reference a disturbance and a possible fight between females. The callers have no

---

[2] In a *sua sponte* Memorandum Opinion and Order issued in this case on June 3, 2015, Chief Judge Armijo dismissed Plaintiff's claims against all but one of the named Defendants, reasoning that "[t]he complaint makes no allegations against any of the named Defendants except Detective Russ Landavazo, and Plaintiff thus fails to make an affirmative link between these other Defendants and the asserted violations." *Doc. 12* at 2.

[3] Because the contents of this affidavit are at the heart of this dispute, the Court will quote it exactly without any reference to perceived misspellings or grammatical errors but redacting personal identifiers such as phone numbers, addresses and dates of birth if not material to the issues.

additional information and the call is held for available APD units. At approximately 0307 hours APD Dispatch received call from several residents at 7601 Lomas Blvd. NE reference the sounds of multiple gunshots fired as well as the sounds of glass breaking and someone screaming. On arrival, the responding APD units locate the scene of the shooting at apartment #55 at this address. Officers locate a female, later identified as Naomi Trujillo, lying in the open doorway of apt. #55 alive but suffering from apparent gunshot wounds. Naomi was transported to the University of New Mexico Hospital (UNMH) and was pronounced deceased a short time later. Subsequent contact with hospital staff indicate Naomi did not know who shot her. Upon clearing the residence officers locate a second female, later identified as May Valerio, lying in a bedroom closet, apparently deceased and suffering from at least one apparent gunshot wound.

Approximately 15 minutes after the call at 7601 Lomas Blvd. NE, a male subject entered the Emergency Room at UNMH, advising he had been shot on Lomas Blvd. near the "Holiday Bowl." (Adjacent to 7601 Lomas NE) This male, later identified and heretofore referred to as RD due to his fears of outstanding offender(s), suffered an apparent gunshot wound to his torso. RD underwent surgery and subsequently recovered from his wounds. The caliber of bullet in this case was found to be consistent with a .38, possibly a revolver due to lack of casings at the scene. I was dispatched to respond to this case as the primary on call APD homicide detective. I was advised that one of the items of evidence present on the sidewalk outside of apt. #55 was what appeared to be a human tooth. Interviews were conducted at my direction with several individuals including RD and residents of the apartment complex at 7601 Lomas NE, and the following information was learned:

The two female victims Trujillo and Valerio had been involved in a physical altercation with two other females later identified as Shalaka Booker and Sabrina Garley, outside of apartment #55 approximately 18 minutes prior to the shooting. The male victim RD was present during this altercation but was not involved physically. Witnesses said Shalaka and Sabrina, along with a male later identified as Felipe Freitas left the scene in a dark colored Sport Utility Vehicle type vehicle that had been parked north of the victim's apartment.

The surviving victim, RD, advised after that initial fight was over he and Naomi were sitting on her couch and May was in the kitchen, when suddenly he saw a "sneakered" foot "donkey kick" (indicated as a backward kick) the window next to Naomi's front door.

RD said Naomi got up to investigate and he walked behind her, and as she opened the front door a black male adult with short hair wearing a zip

3

up gray hooded sweatshirt with the hood down, squatted into the broken window space and began firing into the apartment with what appeared to be his left hand. RD said he exited the apartment as the neighbors gathered after the shooting and he saw a black male on his phone and heard him yelling at someone about "shooting up my place," or words to that effect, and said this male was not the one who shot him. RD said he only got the briefest glimpse of the suspect and did not think he could identify him beyond this.

Several neighbors advised a black male who lives at the complex in apt. #64, later identified as Sasha Jennings, came up after the shooting and before police arrived and was heard saying into his cell phone, "Why would you come and shoot up my apartment complex?" or words to that effect. Sasha was interviewed on scene when he returned several hours after the shooting. Sasha said he had been standing on the north side of the complex where he parks his car when he observed an "old school" white or gray vehicle driving "crazy" and revving the engine and he watched the vehicle make a right hand turn west of the complex, which is an access point to the north side of the complex. Sasha said moments later he heard multiple gunshots from the north side of the complex. Sasha said he made a "common sense" assumption this vehicle was involved in the shooting. Sasha said he ran to the location and observed the female he recognized by face as the tenant of #55 lying in the doorway to her apartment. Sasha said he yelled at some of the neighbors because they were just standing around and he told them if they wanted to help they should call the police. Sasha said he saw a white male (RD) who appeared to have been shot based on the way he was holding himself but he did not know him.

Sabrina Garley was contacted at her place of employment later that afternoon and was interviewed after being advised of her Constitutional Rights per Miranda and waiving her rights. Sabrina advised during her interview that she and Shalaka had been involved in an altercation with Sasha Jennings, the father of Shalaka's children, in the downtown area earlier that night during which Sasha broke Sabina's new phone. After the altercation Shalaka drove Sabrina and Felipe Freitas to 7601 Lomas NE in a black Expedition SUV so she could attempt to get money from Sasha, who lived in apartment #64 at this address. Sabrina said Shalaka parked on the north side of the complex and waited in the vehicle while Sabrina and Felipe went upstairs to talk to Sasha. Sabrina said Sasha was not at his apartment so she went to her ex-boyfriend's apartment, Charles Hazelton AKA "Rev" in apartment #69. Sabrina said Naomi Trujillo came upstairs and started an argument with her about being at "Rev's" house. This confrontation eventually led to the physical confrontation downstairs between Shalaka and Naomi, with Sabrina and May being minimally involved physically. Sabrina said Shalaka got kicked in the mouth and lost

4

a tooth and was extremely upset because of the damage done to her mouth. Sabrina said after the confrontation she was driven home by Shalaka to her house at _____ where they all went in while Shalaka washed her mouth out and assessed the mouth injury. Sabrina said she then drove Felipe home in her vehicle, a green Saturn, and stayed at his residence, located near 7th and Bellamah NW, for the remainder of the evening and did not know where Shalaka went when she left. In a separate interview Felipe confirmed he was driven home by Sabrina after the fight and did not know where Shalaka went.

Shalaka was unable to be located at any of the addresses listed in standard police databases and the news media was utilized to broadcast her name and description as a person of interest in this case. Approximately forty five minutes after the first news broadcast, I was contacted by Dispatch, who advised me Shalaka had called requesting to meet with me. Shalaka agreed to meet with me at APD Main Station and said she would be driving her black Ford Expedition. Upon meeting with Shalaka at the APD Main, she stated she was dropped off by her mother and did not drive her vehicle or have the cell phone she indicated was hers with the number 505-_____. I told Shalaka of the incident we were investigating which included the initial fight at the apartment complex and the shooting afterwards. I advised Shalaka of her Constitutional Rights per Miranda and she said she understood her rights and would give a statement.

Shalaka confirmed she and Sabrina were downtown earlier before the shooting and got into an altercation with the father of her kids, Sasha Jennings, during which Sasha broke Sabrina's phone. Shalaka said after the altercation Sabrina talked her into driving her to Sasha's apartment at 7601 Lomas NE to get money for the broken phone. Shalaka said they picked up a person Sabrina called "Brazil," (Felipe Freitas) someone she believed Sabrina had been dating, at his house near 12th and Lomas. Shalaka said they all headed up to Sasha's apartment in her black "Ford Expedition" but with Sabrina driving. Shalaka said Sabrina parked on the back side (north) of the apartments. Shalaka said she decided to wait in the car because she did not want to get involved in the incident further. Shalaka said she had been calling Sasha at his number, _____ but he was not answering, so she told Sabrina she did not think Sasha was home. (Later review of Shalaka's phone records around the time prior to the initial fight, 0248 hours, show only one outgoing call from Shalaka to Sasha at approximately 0218 hours, for a duration of approximately 5m:25s)

Shalaka said Sabrina and "Brazil" were gone for about ten minutes when she heard a loud noise and looked out to see Sabrina arguing loudly with two unknown females so Shalaka exited the vehicle and tried to intervene.

5

Shalaka said the taller female "smacked me in my face," and grabbed her by the hair, so they started fighting and fell to the ground. I showed Shalaka a picture of both Naomi Trujillo and May Valerio and she said the taller girl appeared to be Naomi and the shorter was possibly May. I then showed her a picture of Sabrina Garley and she said this is the Sabrina who was with her at the apartments. Shalaka said when she started to get up someone kicked her in the mouth and she lost her tooth, which she spit onto the sidewalk. Shalaka said she told Sabrina, "let's go, I lost my tooth." Shalaka said it felt like her face was "caved in." Shalaka said they went to her vehicle and she drove them to Sabrina's house, located at _____ approximately a half mile from the victim's apartment. Shalaka said she went inside Sabrina's house and then into the bathroom to wash her mouth out. Shalaka said when she came out of the bathroom she started yelling at Sabrina for getting her involved in the incident which caused her to lose her tooth and asked her how she ended up at "Rev's" house when she went to get money from Sasha. Shalaka said Sabrina told her Sasha did not answer her door so she decided to say hello to "Rev." Shalaka said she then left Sabrina's house and "that was pretty much it."

I asked Shalaka how long she stayed at Sabrina's house and she said she was not there very long. I asked Shalaka where she went after she left Sabrina's and she said she went to her boyfriend's house, Alfonso Thompson AKA "Boo" or "Boo Money," in the area of Utah and Kathryn SE. (This address was later found to be _____ SE, approximately just over two miles from Sabrina's house and approximately 2 and a half miles from the victim's apartment) I printed a picture of Alfonso Thompson with a date of birth of _____ and she confirmed this is the Alfonso she was referring to as her boyfriend. Shalaka provided a phone number for Alfonso of 505-_____ I asked Shalaka if she told Alfonso what happened at the apartment complex and she said she did, but she did not tell him about her kid's father being involved prior to the fight. I asked Shalaka what Alfonso told her in response and she said he told her not to hang around with Sabrina anymore because he could tell she was on drugs. Shalaka said Alfonso, who was "half asleep" and "out of it" when she arrived, seemed uninterested beyond this and told her to "sleep it off."

I asked Shalaka if she and Alfonso stayed at his house the rest of the night and she said they did, and she did not leave until around 1100 hours this date. (Later review of Shalaka's phone records around the time of the shooting show she received incoming calls from Alfonso's phone number at 0300, 0306, 0308, 0310, 0319, and 0324. Shalaka also appeared to no longer be at Sabrina's house during that time because based on her phone records she dialed the number registered to the Garley residence, _____, seven times between 0313 and 0316 hours.) I asked Shalaka again whether she or Alfonso left his house at all after she told him what

6

happened and she said they did not. I asked Shalaka what type of vehicles Alfonso drove and she said he drives a black Mercedes. I asked Shalake where her black Expedition was now and she said it was at her Aunt's house parked on the street. I asked Shalaka when she first found out there had been a shooting at the apartment complex where she got in a fight and she said it was at the nine o'clock news when she saw her picture shown as a "person of interest." (Later review of Shalaka's phone records shows multiple calls between her and Sasha at the approximate time of and also after the shootings.) I told Shalaka most people would be very upset about having a tooth kicked out but Shalaka said she "wasn't even mad," about losing the tooth, she was mostly mad at Sabrina and Sasha for getting her involved in an incident because of a broken cell phone.

Approximately three days after the shootings, I went back to 7601 Lomas Blvd. NE to contact Sasha Jennings, based what I learned about his involvement in the dispute with Shalaka and Sabrina prior to the shootings. I contacted the manager who advised Sasha had broken his lease and moved out, incurring a cost of approximately 300 dollars for the early termination. The manager showed me paperwork that Sasha provided as his reason for moving out, and it stated that due to the homicides at the complex he was in fear for his life. I contacted Sasha by phone and he agreed to meet with me and provide a second interview. During the second interview with Sasha he acknowledged he did not mention his relationship with Shalaka because he was afraid to get involved. Sasha said he and Shalaka had been exchanging phone calls (Later confirmed by both Sasha and Shalaka's phone records) since the incident downtown where he broke Sabrina's phone, which he did because Sabrina had struck him in the head with it. Sasha said at one point early that morning as he was headed home, he was on the phone with Shalaka and she told him her tooth had been kicked out, and she was "crazy and hysterical". Sasha said Shalaka was not making much sense she just kept saying, "My tooth, my tooth." (Later review of phone records showed a call between Sasha and Shalaka's phone at approximately 0250 hours for the duration of approximately 1 minute and four seconds, approximately two minutes after the initial fight was reported.)

Sasha said when he arrived home he was at the south side of the complex in the parking lot when he observed a light blue Buick vehicle he recognized as belonging to Shalaka's current boyfriend, Alfonso "Boo" Thompson, driving erratically westbound on Lomas. Sasha said he has known Alfonso for approximately 12 years and has seen him in this car before. Sasha said the windows were tinted so he could not see who was inside the vehicle. Sasha said he watched as the vehicle turned north on the next street to the west of the complex, an access point to the north side of the complex. Sasha said he began "mentally tracking" the vehicle

7

because he believed it was headed to the north side of the complex based on what Shalaka said had happened to her. Sasha said Shalaka then called him and he began asking her what was going on with Alfonso being here, when he heard gunshots from the north end of the complex. Sasha said when the shots went off Shalaka told him, "I'm gone, I'm gone." I asked Sasha what he thought she meant by this and he said he thought she was saying she was either going to run away or her life was over. (Later review of phone records confirmed Sasha and Shalaka's phones were connected at approximately 0307 hours, the approximate time of the shooting, for the duration of approximately 1 minute and 3 seconds.)

Sasha said after the shooting he received a call from a blocked number on his cell phone but he recognized the caller to be Alfonso Thompson. Sasha said based on what he saw and what Shalaka told him he knew Alfonso was involved in the shooting, and it was not normal for Alfonso to be calling him. Sasha said Alfonso tried to say something to him but he immediately cut him off and told Alfonso he was "an idiot" if he came to shoot the place up because Shalaka got into a fight. (This is consistent with the earlier mentioned witness statements of what Sasha was heard saying into his phone, and later review of Sasha's phone records show an incoming call from 505-_____, the number identified by Shalaka as Alfonso's cell number and a number that would have been viewed as blocked by Sasha, at approximately 0308 hours for the duration of approximately four minutes.) Sasha said Alfonso responded, "Your baby mama got disrespected, they kicked her teeth out." I asked Sasha if he thought Alfonso was trying to intimidate him with this call and he said he thinks that may have been his intention but he would not let Alfonso talk much so he was not sure. However, Sasha acknowledged this is the reason he broke his lease and moved out of his apartment, costing him almost three hundred dollars, because he knows Alfonso lives in the area of Wyoming and Zuni and he felt this was too close to his home and he was afraid of what Alfonso might do to him. After the interview I told Sasha I would want to talk to him again when some of the physical evidence, such as phone records and surveillance video, had been analyzed, and he agreed to meet with me again.

Based on Sasha's second statement I compiled a photo array containing a picture of Alfonso Thompson in position number 2. I then met with victim RD, who was still in the hospital recovering from his wounds, and asked him again if he felt he would or would not be able to positively identify the person who shot him. RD said he would look at the array but felt he did not get a good enough look at the suspect to positively identify him. RD said when he realized there was a person crouching in the broken window space he only registered that it was a black male adult with short hair, wearing a gray hooded sweatshirt without the hood up, and possibly wearing gray sweatpants. RD said he saw the man for less than a second

8

when the first shot went off, and he must have been struck with the first shot because he immediately moved behind the door for cover and realized he had been hit. I showed RD the photo array as mentioned above and he said he could not identify the suspect in the line up. I asked RD if that meant he was sure the suspect was not in the line up and he said the suspect could be there but he would not be able to pick him out based on the short glimpse he saw of him. Note that the description given by RD is similar to Alfonso's appearance, a black male adult with short hair.

I reviewed surveillance footage from the security camera mounted on the business located just east of 7601 Lomas Blvd. NE. The camera shows a fixed southward position and captures east and westbound Lomas just east of the apartment complex. I observed a vehicle that appeared to be consistent with Shalaka's black SUV travelling eastbound on Lomas at approximately 0253 hours, just after the initial fight where Shalaka lost her tooth, and the logical direction for the vehicle to travel toward Sabrina's house. I also observed a light colored passenger car driving westbound on Lomas at approximately 0304 hours just before the reported shootings. I observed two vehicles travelling eastbound on Lomas at approximately 0309 hours just after the reported shootings, one of them appeared to be the same black SUV seen westbound at 0253 and the other that appeared to be similar to the light colored vehicle seen travelling westbound at 0304. I then obtained information from New Mexico Motor Vehicles Division (MVD) that in addition to a black 1993 Mercedes with a Vehicle Identification Number (VIN) of _____ bearing a possible NM plate of 361PSY; Alfonso Thompson has a blue 1997 Buick in his name with a VIN of _____ bearing a possible NM plate of 359PSY.

I reviewed the call history that came into APD Dispatch the night of the shooting and located a shots fired call which came in from an anonymous caller near Grove and Marble, just north of the victim's apartment complex. The caller indicated they heard "yelling and screaming" followed by 4-5 gunshots, then observed a "blue Dodge Durango" and a "white Sedan" leaving at a high rate of speed westbound on Marble. Both vehicles described are of a similar style and color to both Shalaka's SUV and the vehicle identified as Alfonso's Buick.

I contacted Sasha again and told him I would like to go over some of the evidence mentioned above, and Sasha agreed to meet at my office. I showed Sasha the video surveillance from the car lot just east of the apartment complex at 7601 Lomas NE. I showed Sasha the footage showing of the black SUV travelling eastbound on Lomas at approximately 0253 hours, just after the initial fight. I asked Sasha if he recognized this vehicle and he said this vehicle does look like Shalaka's black SUV. I showed Sasha the video footage of a light colored vehicle travelling

9

westbound on Lomas at approximately 0304 hours, just before the shooting. Sasha said this vehicle does look like the vehicle he recognized as Alfonso's light blue Buick. I showed Sasha the video footage from approximately 0309 hours, just after the shooting, showing what appears to be the same light colored vehicle seen westbound at 0304 hours, now travelling eastbound with what appears to be the same black SUV he believed was Shalaka's also traveling eastbound behind it, and he confirmed these two vehicles are the ones he said appeared consistent with Alfonso's and Shalaka's vehicles. I showed Sasha several vehicles that passed in front of the camera to see if his identification was consistent and he viewed several that he discarded as either Shalaka's or Alfonso's vehicles.

I asked Sasha to relay again his phone contacts with Shalaka and Alfonso that night. Sasha said during the first call after Shalaka told him she had been in a fight she was "irate" and sounded "drunk," and kept saying, "Oh my Gosh, look at my mouth," and it sounded to Sasha like she was looking into a mirror. Sasha said the next time he actually spoke with Shalaka was when he saw what he recognized as Alfonso's vehicle driving erratically westbound on Lomas just prior to the shooting. Sasha said as he began mentally tracking the vehicle wondering what was going on, Shalaka suddenly called him. Sasha said he asked Shalaka what was going on and Shalaka told him "If you are at your house, get down." Sasha said this was followed by the sound of gunshots and this led him to realize Shalaka was warning him about the impending shooting. Sasha said when Alfonso called him after the shooting and Sasha started yelling at him for shooting the place up, Alfonso's response was "well they disrespected your baby mama" by kicking her teeth out. Sasha said he told Alfonso that was exactly right she is the mother of Sasha's children and he (Sasha) did not respond like that, and Alfonso replied, "Yeah, I feel you."

Subsequent observation of Alfonso Thompson's residence at 8204 Kathryn SE confirmed the above mentioned black Mercedes, which does bear NM plate 361PSY, was parked at his residence and also his place of business located at 145 Jackson NE.

During observation of Alfonso's place of business I observed a light blue Buick, consistent with a 1997 model as indicated on Alfonso's MVD records, with tinted windows parked inside a fenced area backed in so the plate is not visible. I observed this vehicle is such a light color that it is easily described as white or silver. I then viewed the surveillance video again and compared the vehicle parked at Alfonso's place of business to the one identified by Sasha in the video and found this vehicle is similar in style and color.

10

*Doc. 17-34* at 4-8; *Doc. 17-35* at 1. On the basis of these facts, Defendant sought to arrest Plaintiff for the following offenses: open count of murder, conspiracy, shooting at an occupied dwelling, aggravated burglary, aggravated battery, intimidation of a witness, and tampering with evidence. *Doc. 17-34* at 3.

Plaintiff asserts that Defendant's affidavit in support of the arrest warrant failed to demonstrate probable cause to support his arrest and omitted certain material facts. *Doc. 21* at 2-6. For the reasons that follow, the Court disagrees.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1); *see also* D.N.M.LR-Civ. 56.1(b).

Section 1983 permits suits for damages against governmental officials who cause the "deprivation of any rights, privileges, or immunities secured by the constitution and laws" while acting "under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.

> "Individual defendants named in a § 1983 action may raise a defense of qualified immunity," . . . which "protects 'government officials performing discretionary functions' and shields them from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Pauly v. White*, 814 F.3d 1060, 1069 (10th Cir. Feb. 9, 2016) (quoting *Cillo v. City of Greenwood Village*, 739 F.3d 451, 459 (10th Cir. 2013); *Swanson v. Town of Mountain*

11

*View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009)). "Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

"A plaintiff can overcome this presumption of immunity only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity[.]" *Id.* "Courts have discretion to decide the order in which to engage these two prongs." *Tolan*, 134 S. Ct. at 1866. While the Court finds that the law pertinent to this case is clearly established, Plaintiff has failed to show that Defendant violated one of his constitutional rights and Defendant is therefore entitled to qualified immunity.

### III.     ANALYSIS

Plaintiff's sole claim is for malicious prosecution in violation of the Fourth Amendment. *Doc. 1* at 2-3.[4] When a plaintiff is imprisoned pursuant to legal but wrongful process, he has a constitutional claim for malicious prosecution. *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). "At common law, the issuance of an

---

[4] "The Supreme Court has not yet explicitly decided whether such a claim exists in these circumstances under the Fourth Amendment or the procedural component of the Due Process Clause," although the Tenth Circuit has indicated that it doubts "that a forged arrest warrant functions as legal process that terminates a Fourth Amendment claim and starts a due process claim." *Mondragon*, 519 F.3d at 1083. The Tenth Circuit has held that certain facts post-arrest could support a claim post-arrest, *see Pierce v. Gilchrist*, 359 F. 3d 1279 (10th Cir. 2004); however, it has declined to extend the Fourteenth Amendment's protections in factually similar circumstances, i.e., where the probable cause supporting an arrest warrant is challenged. *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013). Thus, because Plaintiff's claim in this cause focuses on his arrest pursuant to an allegedly deficient warrant, it is more properly a challenge to "the probable cause determination is supporting the warrant's issuance" under the Fourth Amendment. *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008); *Myers*, 738 F.3d at 1195 ("where detention occurs after the institution of legal process a plaintiff can claim that the legal process itself was wrongful, and thereby state a Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action.").

arrest warrant represents a classic example of the institution of legal process." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) ("Plaintiffs' detention was thus preceded by the institution of legal process, triggering the malicious prosecution cause of action"). The Tenth Circuit has set forth the following elements for a Fourth Amendment malicious prosecution claim: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins*, 528 F.3d at 799 (citations omitted).

The Court notes that Plaintiff has arguably met the first, second and fifth elements. However, Plaintiff has provided no evidence that Defendant acted with malice, as required to support the fourth element. *Compare Doc. 21* at 6 *with Wilkins*, 528 F.3d at 800. Moreover, Plaintiff has failed to show that no probable cause supported his arrest.

An arrest warrant must be supported by probable cause to comply with the Fourth Amendment. *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). "The probable cause requirement is central to the common law tort, because not every arrest, prosecution, confinement or conviction that turns out to have involved an innocent person should be actionable." *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual has committed the crime." *Taylor*, 82 F.3d at 1561 (citations omitted); *Wolford*, 78 F.3d at 489 (citations omitted). "It is a violation of

the Fourth Amendment for an arrest warrant affiant to knowingly or with reckless disregard for the truth, include false statements in the affidavit . . . or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Wolford*, 78 F.3d at 489 (citations and internal quotation marks omitted).

> Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. . . . In a case involving information omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990)); *see also Taylor*, 82 F.3d at 1562; *Pierce*, 359 F.3d at 1293.

Simply put, the Court finds that none of the allegedly exculpatory facts cited by Plaintiff, considered either alone or together, would have vitiated probable cause for the arrest warrant. *See Stewart*, 915 F.2d at 582-83; *Wolford*, 78 F.3d at 489; *Taylor*, 82 F.3d at 1562. Plaintiff identifies five facts that he claims vitiate probable cause. First, Plaintiff points out that Shalaka Booker told Defendant that after the shooting "she had gone to the Plaintiff house where she stay the rest of the night." *Doc. 21* at 2. Plaintiff argues that Ms. Booker's statement proves he could not have been involved in any shooting on the night in question. *Id.* Second, Plaintiff asserts that there was "no positive identification" that he "was the passenger of vehicles near the scene of the murder." *Id.* at 3. Third, Plaintiff argues "that the surviving victim described the shooter as a black male possibly in his twenties," and that this description arguably fits Felipe

Freitas. Fourth, Plaintiff again contends that even though Sasha described the vehicle approaching and leaving the scene of the shooting as his, "no detail could be discerned to make positive identification, [and] this is the most important thing in the Plaintiff case." *Id.* at 4. Finally, Plaintiff alleges that Defendant lied in his supplemental offense report about the timing of the interviews of Sasha "and that was the Defendant Basis to his probable cause." *Id.* at 4-5.

      This evidence does not vitiate probable case. With the exception of the shooter being identified as "possibly in his twenties," all of the evidence that Plaintiff claims is exculpatory was included in Defendant's arrest warrant affidavit. Specifically, Defendant notes that Shalaka Booker told him that she went to Plaintiff's house after the initial confrontation with May Valerio and Naomi Trujillo, *Doc. 17-34* at 6, and that when Sasha Jennings identified Plaintiff's vehicle he admitted that "the windows were tinted so he could not see who was inside the vehicle," *Id.* at 7. Additionally, to the extent that Defendant misstated the timing of his interviews with Sasha Jennings, Plaintiff does not demonstrate or allege how this misrepresentation is material or vitiates probable cause. Finally, the mere fact that Defendant failed to include in the affidavit that the shooter was described as "possibly in his twenties" does not foreclose the identification of Plaintiff, a thirty-six year old black male with short hair, as the shooter.

      To the contrary, "[a]gainst these inaccuracies are a wealth of uncontested facts which demonstrate a substantial probability" that Plaintiff committed the murders at issue in this case. *Taylor*, 82 F.3d at 1562. It is uncontested that the victims were killed a mere eighteen minutes after Plaintiff's girlfriend, Shalaka Booker, had her tooth knocked out in a confrontation with them. As related by Sasha Jennings, Ms. Booker

15

was very upset by the loss of her tooth, and it is undisputed that she went to Plaintiff's house after the confrontation. There is also the matter of Sasha Jennings' identification of Plaintiff's vehicle both driving erratically towards the apartment complex before the shooting and leaving it after. While he could not identify Plaintiff by face, Mr. Jennings has known Plaintiff for twelve years and was specifically able to identify the vehicle as his. Finally, most telling are the phone calls received by Mr. Jennings both before and after the shooting, first from Ms. Booker before the shooting, telling him to "get down," and second, from Plaintiff after the shooting, all but admitting to committing the murders because Ms. Booker (Sasha's "baby mama") had been "disrespected." *See generally Doc. 17-34* at 3-8; *Doc. 17-35* at 1. When these facts are viewed as a whole, there was probable cause to support Plaintiff's arrest for murder. *See* NMSA 1978, § 30-2-1.

In addition to failing to disprove probable cause, Plaintiff must also provide evidence that Defendant omitted the facts at issue "knowingly or with reckless disregard for the truth, rather than out of negligence or inadvertence." *Taylor*, 82 F.3d at 1563. Plaintiff provides no such evidence in this case.

Finally, once Plaintiff was arrested, Defendant's participation in the matter ended, and Plaintiff does not allege that Defendant made false or misleading statements following his arrest, or somehow caused false or misleading testimony to perpetuate the remainder of Plaintiff's prosecution. The Tenth Circuit has previously held that such circumstances foreclose Defendant's liability post his procurement of the arrest warrant. *Taylor*, 82 F.3d at 1564; *compare Robinson v. Maruffi*, 895 F.2d 649, 655-56 (10th Cir. 1990) (holding that the causal chain was not broken where officers manufactured false testimony). Moreover, while trial on the shooting was pending, Plaintiff was in the lawful

custody of the United States awaiting sentencing on federal firearms charges, which he pled guilty to. *See Doc. 17-39* at 1-11.

### IV. CONCLUSION

Plaintiff has failed to show that facts omitted from Defendant's arrest warrant affidavit would have vitiated the probable cause to arrest him for the murders of May Valerio and Naomi Trujillo. Accordingly, Plaintiff has failed to establish that Defendant violated his clearly established constitutional rights, and Defendant is therefore entitled to qualified immunity.

Wherefore,

**IT IS HEREBY RECOMMENDED** that this Court construe Defendant's *Martinez* Report as a Motion for Summary Judgment (*Doc. 17*), and that it be granted.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**